**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-00045-CMA-KLM

STEPHANIE LOPEZ, individually,

      Plaintiff,

v.

Carl Edwards,
Individually,

and

Casper Trailer Sales, Inc.,
a Colorado corporation

      Defendants.

---

**Appendix to Plaintiff's Response to Defendant's Motion for Partial Summary
Judgment**

---

Plaintiff's Appendix consists of the following:

1. Verifications of Employment Signed by Carl Edwards

   p. 1    Note dated February 10, 2012

   p. 2    Note dated February 18, 2014

   p. 3    Note dated September 8, 2014

2. Time cards for Periods after March 7, 2016

3. Defendants' Responses to Plaintiff's Second Set of Discovery Requests

4. Excerpts, Deposition of Carl Edwards

**JDL Trailer Sales**
2734 Lake Avenue
Pueblo, CO 81004
Parts/Service 564-8056
Sales (719) 561-0421

FEB 2 1 2017

To whome iT mAy Concern

ms STephANie Lopez works
For me For Room AND BOARD.

2/10/2012

Carl Edwards

#(719) 242-6212

LOPEZ0005

Appendix 1, page 1

To whom it may concern I
Stephanie Lopez have no changes
to report other then a mailing address
change from 1208 Elko to 2734 LAKE Ave
                    Pueblo CO 81004      Pueblo CO 81004
I still work for Carl Edwards
& J D I 6 days a week doing clean up
and Pit crew.
Stephanie Lopez 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     2/18/14
2734 LAKE Ave
Pueblo Co 81004     Rachael Edwards

RECEIVED
FEB 18 2014
DEPARTMENT OF SOCIAL SERVICES
PUEBLO COUNTY COLORADO

RECEIVED
FEB 18 2014
DEPARTMENT OF SOCIAL SERVICES
PUEBLO COUNTY COLORADO

LOPEZ0007

**Appendix 1, page 2**

9-8-14

I Stephanie Lopez work for
Carl Edwards in exchange I learn
the Knowledge, and experience I need
for the type of business I'm interested
in building. I work 38 hours and up
I've worked for Carl Edwards the begining
of 2013. 1229 Van Buren  Stephanie Lopez

2734 LAKE Ave. Pueblo Co    x Carl Edwards
        81004
              (719) 242-6212
                 %o J.D.L TLR SALES

Stephanie Lopez
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

RECEIVED

SEP 08 2014

DEPARTMENT OF SOCIAL SERVICES
PUEBLO COUNTY, COLORADO

LOPEZ0008

Appendix 1, page 3

**Left time card:**

NO.

NAME _Stef_

PAY PERIOD ENDING
3/25/16

| R.T. HOURS | RATE | AMOUNT | F.I.C.A. | NUMBER OF EXEMPTIONS |
|---|---|---|---|---|
| | | | FED. WITH. TAX | |
| O.T. HOURS | RATE | AMOUNT | STATE WITH. TAX | TOTAL EARNINGS |
| | | | STATE DIS. | |
| HOURS | | AMOUNT | STATE U.C. | TOTAL DEDUCTIONS |
| | | | CITY WITH. TAX | BALANCE DUE |
| | | | OTHER | |

| Days | | | | | | Hours |
|---|---|---|---|---|---|---|
| 1 | ᴾ08:02 | | | ᴾ04:31 | | |
| 2 | ᴾ07:57 | | | ᴾ04:43 | | |
| 3 | ᵂ08:14 | | | ᵂ04:48 | | |
| 4 | ᵀ07:59 | | | ᵀ04:30 | | |
| 5 | ᶠ07:56  800 | | | ᶠ06:02 | | |
| 6 | | | | | | |
| 7 | | | | | | |
| | IN | OUT | IN | OUT | IN | OUT |

TOTAL HOURS SHOWN IS CORRECT.

Weekly Totals

ATR 85111
P/N: 09-1130-000

Acroprint Time Recorder Co., Raleigh, NC

**Right time card:**

NO.

NAME _Stephanie Brown_

PAY PERIOD ENDING
3-29-16

| R.T. HOURS | RATE | AMOUNT | F.I.C.A. | NUMBER OF EXEMPTIONS |
|---|---|---|---|---|
| | | | FED. WITH. TAX | |
| O.T. HOURS | RATE | AMOUNT | STATE WITH. TAX | TOTAL EARNINGS |
| | | | STATE DIS. | |
| HOURS | | AMOUNT | STATE U.C. | TOTAL DEDUCTIONS |
| | | | CITY WITH. TAX | BALANCE DUE |
| | | | OTHER | |

| Days | | | | | | Hours |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | ᴾ07:58 | | 8 | ᴾ04:41 | | 24 |
| 3 | ᵂ08:14 | | 8 | ᵂ04:59 | | |
| 4 | ᵀ08:36 | | 9 | ᵀ06:00 | | |
| 5 | ᴴ03:00 | | | 25 | | |
| 6 | | | | | | |
| 7 | | | | | | |
| | IN | OUT | IN | OUT | IN | OUT Weekly Totals |

TOTAL HOURS SHOWN IS CORRECT.

ATR 85111
P/N: 09-1130-000

Acroprint Time Recorder Co., Raleigh, NC

LOPEZ00046

**Appendix 2, page 1**

LOPEZ00047

Appendix 2, page 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00045-KLM

**Stephanie Lopez, Individually**,

Plaintiff,

v.

**Carl Edwards, Individually**,

Defendant.

---

**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF DISCOVERY
REQUESTS**

---

Defendant Carl Edwards by and through undersigned attorneys, DLG Law Group LLC, responds to Plaintiff Stephanie Lopez's Second Set of Discovery Requests, as follows:

**GENERAL OBJECTIONS**

The following general objections are made as to each and every discovery request and may not be repeated as to any specific request listed below, even though additional objections may be asserted.

A.       Mr. Edwards objects to the Discovery Requests to the extent they seek information or documents that are protected by disclosure by any privilege or immunity, including attorney client privilege, the work product doctrine, or any other privilege, doctrine or immunity available by law.  To the extent the Discovery Requests can be construed to seek privileged or protected documents or information, Mr. Edwards asserts said privilege or protection, objects to the request, and will provide only non-privileged, non-protected documents or information, if any. Any inadvertent disclosure of any privileged information shall not be deemed or construed to constitute a waiver of any privilege or right of Mr. Edwards.

B.       Mr. Edwards objects to the Discovery Requests to the extent they seek to impose duties or burdens on Mr. Edwards that are inconsistent with or in addition to those required by the Federal Rules of Civil Procedure (the "Rules"). To the extent there is any inconsistency between a particular request and the Rules, Mr. Edwards will comply with the Rules.

C.       Mr. Edwards objects to each Discovery Request to the extent that it seeks information that is not relevant to the parties' claims or defenses in the pending action nor proportionate.

D.      Mr. Edwards objects to the Discovery Requests to the extent they are vague, ambiguous, overbroad, unreasonably cumulative or duplicative, or to the extent that compliance with such Discovery Request would be unduly burdensome or oppressive.

E.      Mr. Edwards objects to the Discovery Requests to the extent they seek are propounded for an improper purpose such as to harass.

F.      Mr. Edwards objects to the Discovery Requests to the extent they seek information that is a matter of public record and that is obtainable from some other source that is more convenient, less burdensome, or less expensive.

G.      Mr. Edwards objects to the Discovery Requests to the extent they seek materials or information already known to or in Lopez's possession.

H.      Mr. Edwards objects to the Discovery Requests to the extent they seek information or documents not in its possession, custody or control.

I.      By submitting these answers, Mr. Edwards does not in any way adopt Ms. Lopez's purposed definitions of words and phrases as used in Plaintiff's First Set of Discovery Requests. Mr. Edwards objects to such definitions and usage to the extent that they are inconsistent with the ordinary customary meaning of such words and phrases.

J.      No incidental or implied admissions are intended by the responses herein. The fact that Mr. Edwards has answered part or all of any request contained in the Discovery Requests is not intended to be, and shall not be construed as, a waiver by Mr. Edwards of any part of any objection to any Discovery Requests.

## RESPONSES TO REQUESTS FOR PRODUCTION

1.      Please produce rent receipts for all residents of 1208 Elko from January 1, 2012 to present.

**Response:  Mr. Edwards adopts and incorporates each and every general objection stated above into this response.**

**Mr. Edwards specifically objects to this request on the grounds that the information it seeks is not relevant to the parties' claims and defenses.  Ms. Lopez has asserted claims concerning non-payment of wages under the FLSA, a demand for payment of final wages, and an assault claim.  Any information concerning the 1208 Elko property is not relevant to the claims or defenses in this case.  There are no allegations in the Complaint concerning Ms. Lopez working in exchange for board at 1208 Elko.  Mr. Edwards does not claim that he provided housing in lieu of payment of wages.  In fact, Ms. Lopez did not live at 1208 Elko during any of the period relevant to the Complaint (2014-2016).  Moreover the scope of the request is not tailored to the needs of the case, because it includes dates that are outside the**

2

**scope of the claims or defenses of the action. Ms. Lopez is claiming wages from 2014 to 2016. *See* Scheduling Order. Under the FLSA, Ms. Lopez may claim payment of wages up to three years prior the date of the Complaint at a maximum. Thus any request for information prior to January 2014 would not provide information relevant to the claims or defenses.**

4.     Please produce Federal Tax returns for Casper Trailer Sales, Inc. for years 2014, 2015, and 2016.

**Response:  Mr. Edwards adopts and incorporates each and every general objection stated above into this response.**

**Mr. Edwards specifically objects to this request on the basis that it is not relevant. Mr. Edwards further objects on the basis that the tax returns are confidential in nature and subject to protection from disclosure. Ms. Lopez has asserted claims concerning non-payment of wages, a demand for payment of final wages, and an assault claim. The only relevant basis for requesting tax returns is to establish that Defendant meets the definition of an enterprise under the FLSA. Defendant has admitted that it had gross receipts in excess of $500,000 in 2014-2015, and has denied this information as it concerns 2016 because those tax returns have not been prepared. Therefore, the available tax returns do not provide any additional relevant information and as such Plaintiff has not demonstrated a "compelling need" and the tax returns are not the "least intrusive" means of obtaining the information. *Stone v. State Farm Mut. Auto. Ins. Co.*, 185 P.3d 150, 157 (Colo. 2008); *Carbajal v. Warner*, 10-cv-02862 (D. Colo. Mar. 18, 2013) (applying state doctrine promoting confidentiality as a matter of comity).**

5.     Please produce all business records of Casper Trailer Sales, Inc. for a trailer bought and sold by JDL Trailer Sales an older model bumper pull trailer:

Vehicle Serial # 15126
PA# 9978-19;R
MFD ID# 80-65
Date of MFR 6, 1974
MFD By Santa Fe Trailer CO.

**Response:  Mr. Edwards adopts and incorporates each and every general objection stated above into this response.**

**Mr. Edwards specifically objects to this request on the grounds that the information it seeks is not relevant to the parties' claims and defenses. Ms. Lopez has asserted claims concerning non-payment of wages, a demand for payment of final wages, and an assault claim. Any information concerning the "older bumper pull trailer" is not relevant to the claims or defenses in this case. Mr. Edwards does not claim that he provided any items of value, i.e. the bumper pull trailer, in lieu of payment of wages.**

3

## RESPONSES TO REQUESTS FOR ADMISSION

1.      Admit or deny that Casper Trailer Sales, Inc. had gross receipts in excess of $500,000.00 each year 2014, 2015 and 2016.

**Response:  Mr. Edwards adopts and incorporates each and every general objection stated above into this response.  Admit as to 2014 and 2015.  The 2016 tax returns have not been prepared yet, therefore deny as to 2016 on the basis of information known at this time.  Mr. Edwards will update this request as required by the rules**

Respectfully submitted this 28th day of August, 2017.

*s/Lily E. Nierenberg*
Lily E. Nierenberg
Atty. Reg. No. 45451
DLG Law Group LLC
4100 E. Mississippi Avenue, Suite 420
Denver, Colorado 80246
303-758-5100
Fax 303-758-5100
lnierenberg@dlglaw.net

4

**Appendix 3, page 4**

## <u>CERTIFICATE OF SERVICE</u>

The foregoing Defendant's Response to Plaintiff Stephanie Lopez's Second Set of Discovery Requests were served on the following counsel via email August 28, 2017, to follow by U.S. Mail:

Donna Dell'Olio
Cornish & Dell'Olio PC
431 N Cascade Ave, Suite 1
Colorado Springs, CO  80903

> *s/Lily E. Nierenberg*
> DLG Law Group LLC

**Appendix 3, page 5**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 11 to 14)

| Page 11 |
| --- |

1    Okay?
2    MS. NIERENBERG:  Objection to form.
3    BY MS. DELL'OLIO:
4    Q.  Is that okay?  I'm trying to give you an
5    alternative.
6    A.  Well, my daughter is here.  She came up with me.
7    Q.  All right.
8    A.  She does all the bookwork.  I don't.
9    Q.  Well, maybe during a break you can ask her.
10   A.  Okay.
11   Q.  All right.  Now, you've described two
12   corporations, SJE Holdings and Casper Trailer Sales, Inc.
13   A.  Yes.
14   Q.  Are there any other Colorado corporations which
15   you have an ownership interest in?
16   A.  No.
17   Q.  Does Casper Trailer Sales, Inc., engage in any
18   business other than the sale of new and used recreational
19   vehicles and service of recreational vehicles?
20   A.  No.
21   Q.  And what is the business of SJE Holdings?
22   A.  The property.
23   Q.  And so the -- you described a motel and a storage
24   yard that are owned by SJE Holdings.
25   Do they hold any other property?

| Page 12 |
| --- |

1    A.  We have -- I have one -- I have one mobile home we
2    rent, and we have what we call the farmhouse or the farm,
3    whatever you --
4    Q.  Any other property owned by SJE Holdings?
5    A.  No.  Well, yes.  I'm sorry.  I can't remember them
6    all.  I have a piece of property in Cripple Creek, just a
7    bare piece of property.
8    Q.  Have you been in the casino business in the past?
9    A.  Yes.
10   Q.  Not in the last five years?
11   A.  No.
12   Q.  Now, when you operate your business of Casper
13   Trailer Sales, do you, as part of that business, from time
14   to time order parts for the trailers from out-of-state
15   suppliers?
16   A.  Well, yes.  Most all the parts comes from other
17   states.
18   Q.  Okay.  So on a regular basis you order, say, a
19   refrigerator for a trailer or another part that you would
20   use in a trailer from out of state?
21   A.  Many times, yes.
22   Q.  All right.  And you receive those at the Casper
23   Trailer Sales business premises on Lake Avenue in Pueblo?
24   A.  Or JDL is what we call it, yes.
25   Q.  All right.  Do you employ a business manager for

| Page 13 |
| --- |

1    JDL?
2    A.  Yes.
3    Q.  All right.  So I'm going to call it JDL, but I'm
4    referring to the corporation.  It is a corporation called
5    Casper Trailer Sales, Inc.?
6    A.  Yes.
7    Q.  Do you employ a business manager?
8    A.  Yes.
9    Q.  Who is that?
10   A.  At the motel, his name is Tony.  I forget his last
11   name.  It's a colored gentleman.
12   Q.  Okay.  But the motel is not part of the business
13   of JDL Trailer Sales, is it?
14   A.  No.
15   Q.  All right.  Let's talk about JDL Trailer Sales.
16   A.  Sure.
17   Q.  Do you employ a business manager?
18   A.  No.
19   Q.  Okay.  And are you the individual who's
20   responsible for hiring and firing employees of JDL Trailer
21   Sales?
22   A.  Yes.
23   Q.  And has that been true from 2013 to the present?
24   A.  Well, yes.  All the time, yes.
25   Q.  All right.  And let me just -- who are the other

| Page 14 |
| --- |

1    owners of JDL Trailer Sales?
2    A.  Myself.
3    Q.  You're the only owner?
4    A.  Yes.
5    Q.  All right.  What about the SJE Holdings?  Are
6    there other owners of that?
7    A.  Myself.
8    Q.  Okay.  So as the owner and manager of JDL Trailer
9    Sales, are you the one that sets the rate of pay for the
10   employees?
11   A.  Yes.
12   Q.  Okay.  And are you the one that makes the policies
13   for the employees, for example, whether they get a paid
14   holiday?
15   A.  Yes.
16   Q.  Whether they get a vacation day?
17   A.  Yes.
18   Q.  Whether they get paid for all the hours that they
19   work?
20   A.  Yes.
21   Q.  Do you sign their paychecks?
22   A.  Yes.
23   Q.  And are you the one that determines whether they
24   get an hourly rate of pay or a salary?
25   A.  No salary.

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 15 to 18)

Page 15

1    Q. Everybody is hourly?
2    A. Yes.
3    Q. Do you personally look at the timecards and decide
4  what their pay will be for a pay period?
5    A. No.
6    Q. Who does that?
7    A. My daughter does all that. She does all that.
8    Q. And in 2013 through 2015 did you ever review the
9  timecards and determine how many hours the employees would
10  be paid for?
11    A. Occasionally I did, yes.
12    MS. NIERENBERG: Donna, could we just go off the record
13  for one second?
14    MS. DELL'OLIO: Sure.
15    (Discussion held off the record.)
16  BY MS. DELL'OLIO:
17    Q. How many employees did Casper Trailer Sales have
18  in 2013?
19    A. Most -- one we know at -- the parts lady.
20    Q. What was her name?
21    A. Ginger. Don't ask me her last name. She's just
22  been there a short time ago.
23    Q. Okay.
24    A. And the other -- they're not employees. They are
25  contract workers that I have. I have two of those.

Page 16

1    Q. And who -- what positions did they hold?
2    A. They service only.
3    Q. Are they mechanics?
4    A. They're technicians, not mechanics.
5    Q. Okay. Are they technicians, meaning they work on
6  the vehicles?
7    A. They do the scientific work, yes.
8    Q. Okay. Describe some of that scientific work that
9  they do on the vehicles.
10    A. Everything from bumper to bumper, all but the
11  engine and transmission and motor. We do not do that. They
12  do the box work.
13    Q. Okay. So they work with their hands?
14    A. Oh, yes.
15    Q. With tools?
16    A. Oh, yes.
17    Q. All right. And you have two of those individuals,
18  and you refer to them as technicians?
19    A. Yes.
20    Q. And tell me who filled those jobs from 2013 to the
21  present.
22    MS. NIERENBERG: Objection. Form.
23  BY MS. DELL'OLIO:
24    Q. Tell me who your technicians were from 2013 to
25  present.

Page 17

1    A. '13? I'm not sure if they were there at the year
2  '13 or not, but they have been there for the last two years,
3  I know.
4    Q. And what are their names?
5    A. One is Duncan Pelhman, and the other is Rich. I'm
6  not sure of his last name.
7    Q. All right. So two years. This is 2017. That
8  would go back to 2015. Did you have technicians or
9  mechanics working for you in 2015?
10    A. I worked most of the time myself at the shop, and
11  I had two employees at the present time prior to that.
12    Q. Okay.
13    A. But I'm not sure what year -- what dates they
14  worked and they quit.
15    Q. What were their names?
16    A. William Whisman.
17    Q. Okay.
18    A. And I'll think of his other name in a minute. I
19  can't think of it now.
20    Q. We will take a minute to think of the name.
21  How long --
22    A. To think of his name? Pardon?
23    Q. How long did these two individuals work for you?
24    A. William worked for me for the past possibly 15
25  years.

Page 18

1    Q. And did he -- is still alive?
2    A. Oh, yes.
3    Q. All right. But he left in 2015?
4    A. Just about a year ago he left. He had a foot
5  operation at the VA and didn't return.
6    Q. Okay. And the other gentleman?
7    A. The other gentleman only worked one season.
8    Q. I suppose his name would be in your business
9  records?
10    A. Oh, yes, definitely.
11    Q. And other than the four individuals you've
12  identified, did any other technicians or mechanics work for
13  you from 2013 to the present?
14    A. No. This was as far as I remember.
15    Q. Uh-huh. Any other employees?
16    A. But you mentioned -- you keep mentioning '13.
17    Q. Uh-huh.
18    A. But I am not sure of that year. I don't remember
19  back that far.
20    Q. All right. And what about other employees that
21  have worked for you?
22    MS. NIERENBERG: Objection to form.
23  BY MS. DELL'OLIO:
24    Q. Other employees, did you have other employees over
25  the course of the last four years?

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 19 to 22)

| Page 19 | Page 21 |
|---|---|
| 1  A. Stephanie worked for me, yes. | 1  MS. NIERENBERG: Objection. |
| 2  Q. Anyone else? | 2  BY MS. DELL'OLIO: |
| 3  A. I have a manager at the apartments, but he don't | 3  Q. -- do they purchase those? |
| 4  work for me. | 4  MS. NIERENBERG: Objection to relevance. |
| 5  Q. And that's Tony? | 5  BY MS. DELL'OLIO: |
| 6  A. That's Tony, yeah. | 6  Q. Do they purchase those parts, or does JDL purchase |
| 7  Q. Do you have a receptionist at JDL? | 7  those parts? |
| 8  A. My daughter. | 8  A. JDL is the store. We purchase the parts in our |
| 9  Q. Okay. Have you ever employed anyone else as a | 9  store. It goes to our shop to be repaired for the repairs. |
| 10  receptionist? | 10  Q. All right. Is the store and the shop in the same |
| 11  A. No. My wife and daughter does all the paperwork. | 11  building? |
| 12  Q. What is your daughter's name? | 12  A. Yes. |
| 13  A. Julie. | 13  Q. Same address? |
| 14  Q. Did you ever employ someone named Ginger? | 14  A. Yes. |
| 15  A. No. She works at the parts counter selling | 15  Q. Okay. And anyone else who is -- who works on the |
| 16  trailer piece parts, and she's been there for approximately | 16  premises, but is not an employee of JDL? |
| 17  15 years. | 17  A. (No audible response.) |
| 18  Q. Okay. And why do you say she's not your -- an | 18  Q. How about over the last four years? Has there |
| 19  employee of JDL? | 19  been anyone else who's worked on the premises, but is not an |
| 20  A. Oh, she is. | 20  employee of JDL? |
| 21  Q. Okay. | 21  A. No, not that I can recall. |
| 22  A. I never said she wasn't. | 22  Q. Any other relatives that have worked for you |
| 23  Q. All right. Let's talk about employees of JDL. | 23  without pay? |
| 24  Any other employees of JDL? | 24  A. I have no relatives. |
| 25  A. Not that I can remember offhand, no. | 25  Q. Well, you have a daughter and a granddaughter. |

| Page 20 | Page 22 |
|---|---|
| 1  Q. Is your daughter an employee of JDL? | 1  A. Yeah. But you mentioned relatives. Uncles, |
| 2  A. No. | 2  cousins, that's what I am -- |
| 3  Q. She works for JDL, but she's not an employee? | 3  Q. Okay. That's what you call relatives -- |
| 4  A. She's not an employee. She does my payroll and | 4  A. Yes. |
| 5  bookwork that I ask her to do with my wife. | 5  Q. -- cousins? |
| 6  Q. So she does not receive a paycheck? | 6  A. Yes. My daughter is my daughter. |
| 7  A. No. Or my wife does not either. | 7  Q. All right. |
| 8  Q. Now, you indicated that your technicians who | 8  A. I don't think that's a relative. |
| 9  perform scientific work are not employees of JDL. | 9  Q. Anyone else that's related to you that's worked |
| 10  A. No. | 10  for you without pay over the last four years? |
| 11  Q. Does that mean you don't withhold taxes from | 11  A. No. |
| 12  their -- | 12  Q. I guess I could call them your people. |
| 13  A. No. | 13  A. Whatever. |
| 14  Q. -- paychecks. | 14  Q. All right. |
| 15  A. They pay their own. | 15  A. I don't know what you call them. |
| 16  Q. Do you write their checks to them individually or | 16  Q. All right. Now, are you the one that made the |
| 17  to corporations? | 17  decision to pay these technicians as independent |
| 18  A. I write one check, one check to one person, and he | 18  contractors? |
| 19  pays the partner, the other man himself. | 19  MS. NIERENBERG: Objection. Relevance. |
| 20  Q. And do they work on your premises? | 20  BY MS. DELL'OLIO: |
| 21  A. Yes. | 21  Q. Are you the one that made the decision to pay |
| 22  Q. And do they use tools that belong to JDL? | 22  these independent contractors -- these technicians as |
| 23  A. Mostly their own tools. | 23  independent contractors? |
| 24  Q. And what about the parts that they install in the | 24  A. Yes. |
| 25  recreational vehicles -- | 25  Q. Was that your suggestion? |

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 23 to 26)

Page 23

1   A. We negotiate. I don't just suggest.
2   Q. The gentleman who manages the motel, Tony --
3   A. Yes.
4   Q. -- does he get a paycheck from --
5   A. No.
6   Q. -- from the corporation?
7   A. No.
8   Q. What does he get?
9   A. Room and board or an apartment.
10  Q. Well, which?
11  A. Pardon?
12  Q. Which is it?
13  A. He lives in one of the apartments at no cost.
14  Q. Uh-huh. Do you pay him any payroll taxes on his
15  income?
16  A. No.
17  MS. NIERENBERG: Objection. Relevance. This is --
18  MS. DELL'OLIO: You don't need to raise your voice.
19  You can make your objection, and she can hear you.
20  BY MS. DELL'OLIO:
21  Q. Any other individuals who work for you or one of
22  your corporations in exchange for room and board?
23  A. No.
24  Q. How about over the last four years?
25  A. No.

Page 24

1   Q. Was there a gentleman living at the farm, 1208
2   Elko, who was a manager who was working in exchange for
3   rent?
4   A. He was not a manager. He paid rent.
5   Q. He paid rent?
6   A. Yes.
7   Q. Okay. Tell me his name so we are talking about
8   the same person.
9   A. I'm thinking. I'll remember his name in a minute.
10  Yeah, but that's been three, four, five years ago. His name
11  is -- I can't remember. I know him like I know my own name
12  too.
13  Q. Was the manager at the farm or the handyman at the
14  farm named Ron?
15  A. Yes. That's his name.
16  Q. What was his last name?
17  A. She will know. I don't remember it, no.
18  Q. Okay. Were the --
19  A. He was -- he was not a manager. He was a tenant.
20  Q. All right. Was he performing work for you?
21  A. No. He was a handyman.
22  Q. Okay. Was he performing chores around the farm?
23  A. He was mowing the grass. There is no chores to do
24  on that farm of ours, no.
25  Q. All right.

Page 25

1   A. It's just a building.
2   Q. Was he doing handyman work at some of your
3   businesses?
4   A. Yes, he did.
5   Q. Okay.
6   A. Yes.
7   Q. Did you pay him cash for that work?
8   A. No.
9   Q. And why not?
10  A. He didn't require it. I had done him a favor by
11  letting him move in the farmhouse with his wife.
12  Q. And the other RV techs that you employed before
13  the independent contractors who currently work there -- is
14  that confusing to you if I say "you" referring to JDL
15  Trailers?
16  A. No. That's all right.
17  Q. All right. So you know what I am talking about,
18  the business.
19  A. Sure.
20  Q. The other two, was that -- were they Eric and
21  Mike?
22  A. Eric was the other gentleman's name, yes.
23  Q. What about Mike? Did he work as a tech?
24  A. Mike never worked for me.
25  Q. Do you know Mike?

Page 26

1   A. Yes.
2   Q. Eric's son?
3   A. Oh, Bill's son.
4   Q. And he never worked for you?
5   A. No.
6   Q. Was he on the premises performing tasks on the
7   vehicles?
8   MS. NIERENBERG: Objection. Relevance.
9   MS. DELL'OLIO: Actually, you're only supposed to make
10  objections to form. Relevance is not an objection to
11  form.
12  THE WITNESS: Repeat that again, if you can. I don't
13  know what you mean now.
14  BY MS. DELL'OLIO:
15  Q. Mike, who is William's son --
16  A. Right.
17  Q. -- was he working on some of the vehicles?
18  A. Not owned or not operated serviced by JDL. He
19  would come in, sometimes work on his own tractor trailer in
20  our shop.
21  Q. And he never worked on any trailers --
22  A. No.
23  Q. -- or recreational --
24  A. No.
25  Q. -- vehicles --

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 67 to 70)

Page 67

1  Q. All right. Hundreds of hours?
2  A. Hundreds of hours, yes.
3  Q. All right. And during that time did she do any
4  work for you in exchange?
5  A. No, not at the -- she worked on her house herself
6  and I.
7  Q. So if the records are that that house was
8  purchased in 2014, it's your testimony that during that time
9  she didn't do any work for you without getting paid for it?
10  A. She -- oh, "14?
11  Q. Yeah.
12  A. She worked in the last two years, but I'm not sure
13  what years she worked.
14  Q. Well, you've given us pay stubs beginning in
15  spring of 2015.
16  A. Okay.
17  Q. So now I'm asking you about 2014 when you say she
18  was just hanging around your shop and not working.
19  A. That's when she purchased her house, in the '14.
20  I'm not sure now.
21  Q. So during 2014 is it your testimony that she never
22  did any work for you that you didn't pay her for?
23  A. No. She never did, no. Huh-uh.
24  Q. Did she give you anything of value at all?
25  A. No.

Page 68

1  Q. Ever?
2  A. No. She didn't have anything of value.
3  Q. Except her work?
4  A. No. When I put her on the pay -- why I put her on
5  the payroll, she came to me. She said, "I have a house now.
6  I have bills. I have taxes, electricity," et cetera, et
7  cetera. That's when I hired her and put her on the payroll.
8  Prior to that she did not work for me, no.
9  Q. All right. Let's talk about some of the other
10  gifts that you gave her.
11  Did you buy a new furnace for her home?
12  A. Yes, I did.
13  Q. How much did that cost?
14  A. She negotiated the price. She would know better
15  than me. Over $1,000 I'm sure.
16  Q. And a new hot water heater?
17  A. That also.
18  Q. A stove?
19  A. That also.
20  Q. Garbage disposal?
21  A. Also.
22  Q. Paint and numerous other items?
23  A. And we painted the whole house inside and out,
24  carpet, linoleum, done a lot of work on her house, yes.
25  Q. And you paid for all those things that went into

Page 69

1  the house --
2  A. Yes.
3  Q. -- you did?
4  A. She acted like my daughter. We were helping her,
5  yes.
6  Q. No. I know, but -- that's okay. I want to
7  understand what your testimony is.
8  Did the money for that -- for -- to pay for the -- all
9  those items for her house, did JDL pay for that?
10  A. No. Came out of my pocket, my money.
11  Q. Did you ever tell anyone that she was your
12  employee before you put her on the payroll in 2015?
13  A. Not before, no.
14  Q. Did you ever tell anyone that she was the best
15  employee you had?
16  A. Everyone.
17  Q. You told everyone she was the best employee?
18  A. She was a wonderful employee.
19  Q. And you never said that to anyone before you put
20  her on the payroll?
21  A. Not that I -- no, because she wasn't my employee,
22  no.
23  Q. So you never traded her services for gifts and
24  money or room and board; is that right? You never had an
25  agreement with her that you would trade her work for room

Page 70

1  and board?
2  A. No. I always paid her. She had timecards. Every
3  time she came in, she punched a card. She'd leave --
4  Q. Did you --
5  A. -- punched in and punched out.
6  Q. Did you ever tell anyone that she was working for
7  you in exchange for room and board?
8  A. No, I did not because she never did work for me.
9  MS. DELL'OLIO: Let me get the next exhibit marked,
10  please.
11  (Deposition Exhibit 2 was marked.)
12  BY MS. DELL'OLIO:
13  Q. Are you looking at Exhibit 2?
14  A. Yes.
15  Q. Is that your signature?
16  A. Yes.
17  Q. And whose writing is that on the top of that note?
18  A. Stephanie came to me, and she says, "Would you
19  write me a letter so we can get food stamps?"
20  Q. No. That's not my question.
21  A. Oh, what was it? I'm sorry.
22  Q. Whose writing is on that letter?
23  A. That's mine. That's what I just said, yeah.
24  Q. All the writing on this Exhibit 2 is yours?
25  A. All but the stamp. The writing is mine, yes. I

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 95 to 98)

---

Page 95

1     And so when you make a decision to pay an employee, for
2 example, for 40 hours, is that what you believe is fair for
3 the week? Based on the timecard, 40 hours is fair?
4     A. Well, I would presume so. She accepted it. I
5 wrote a check out against it, and she signed the check and
6 spent the money, I presume, so yes.
7     Q. I'm trying to get to why you put 40 on here.
8     A. I don't know. We likely paid her for 40 hours.
9     Q. All right.
10    A. From 4- -- I can't see where she punched in 4
11 something and 4:30, but I -- I'm sure we paid her for 40
12 hours because a lot of times she would come in sick in the
13 mornings late, come home early, go to the doctors, go to the
14 hospital, and many, many times we still paid her for the 40
15 hours.
16    Q. All right. So sometimes the 40 hours didn't
17 represent the number of hours she actually worked?
18    A. Correct.
19    Q. All right. And sometimes, according to the time
20 clock, she worked more than 40 hours?
21    A. Very doubtful. If she did, she would get paid
22 time and a half.
23    Q. Okay.
24    A. But I don't think she ever worked more than 40.
25 She done well to work 20 or 30.

---

Page 96

1     Q. Well, let's look at the next page. That's dated
2 6-12 of '15.
3     Is that Stephanie's writing at the top?
4     A. I think it is, yeah.
5     Q. And is that your writing where it says 40 and
6 4:30?
7     A. That looks the same as the one -- the second one.
8 Exactly the same as the 40.
9     Q. Uh-huh. Well, you produced these.
10    A. Pardon?
11    Q. Your lawyer produced these timecards, so I'm
12 assuming --
13    A. No, my daughter.
14    Q. No. I am sorry.
15    Your lawyer produced these timecards to me.
16    A. Oh, I'm sure.
17    Q. She gave them to me.
18    A. Okay.
19    Q. So I'm assuming these are true business records.
20 Are they so far?
21    A. Yes, they would be. Yeah. Sure.
22    Q. Let's look at this one.
23    A. I am looking at these two where it says 40 and 40.
24 If that's my handwriting, I am not sure. You asked me that.
25    Q. There's a scribble under the 40 on the page we're

---

Page 97

1 looking at now.
2     A. I don't know what that means, no.
3     Q. On this timecard, didn't she leave on the second
4 day at 6:00?
5     A. 6:06. She punched in at 4:32, and she left at
6 6:00. She was employed for two hours.
7     Q. No.
8     Isn't the punch in time on the left, 7:50?
9     A. Oh, I'm sorry. Okay. 207. Now, this -- that's
10 the timecard -- timecard dates. I think it's punched in and
11 punched out on the same line, one, two, three, four.
12    Q. On the left-hand side I see 7:59, 7:50, 7:57,
13 7:58, 7:58.
14    Isn't that the time she arrived?
15    A. That must be the time she arrived, yeah. Uh-huh.
16    Q. The right-hand column says 4:32, 6:06, 4:37, 4:36,
17 and 4:30.
18    Isn't that the times she left?
19    A. Very possible.
20    Q. All right. Well, isn't that 42 hours?
21    A. Could be 42, but when did she punch in? Someone
22 marked her out at 4:30. She didn't punch out. She may have
23 went home early, and she'd still get paid.
24    Q. Let's look at the next page.
25    A. That little S mark there, I don't know what that

---

Page 98

1 one is on there either. I've never seen that before.
2     Q. On the next page, 6-19 of '15 is what this
3 timecard says.
4     A. Uh-huh. Uh-huh.
5     Q. Is that -- whose handwriting is that at the top?
6     A. I presume it's still hers. They put their own --
7 they put their own timecard and put their own name on it.
8     Q. Well, she got paid for 40 hours on this timecard
9 as well?
10    A. Well, you have to figure it out. I'm not sure.
11    Q. Well, look at the pay stub.
12    A. From 7:00 -- or 8:00, 8:00, 8:00, 8:02, 7:58. She
13 punched in on time every morning, and she left at -- that's
14 a 204 -- 4:29 and 5:53, 4:31, 4:30, and 4:31. Now, see,
15 a lot of these times she's sitting there. The shop closes
16 at 3:00, 3:30, 4:00, and she stays there, and she will punch
17 out at 4:00, 4:30, 5:00, or whatever.
18    Q. Was she working?
19    A. No. A lot of times she didn't, no. A lot of
20 times she would go to the doctors. She'd come in the
21 afternoon, and the morning throwing up, and the afternoon
22 heaving her guts out, and someone punched her out. She
23 spent a lot of time at the doctors.
24    Q. Let's deal with one of these pay stubs at a time.
25    Okay

---

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 99 to 102)

Page 99

1    A. Sure. Okay.
2    Q. Looking at the pay stub, it says she was paid for
3  40 hours at $10 an hour; correct?
4    A. Okay.
5    Q. Is that what it says?
6    A. Pardon? This one here?
7    Q. Yeah.
8    A. Yeah.
9    Q. Doesn't that timecard show she worked 42 hours?
10   A. No. Someone marked the 4:30 on there. I don't
11 know. I don't know what time she left, no. I don't
12 remember. I don't know.
13   Q. All right. So you don't know whether these
14 timecards are accurate records of yours?
15   A. No, because another person can pick her card up
16 and punch her out if she leaves at 2:00 in the afternoon.
17 She was friends with everyone.
18   Q. Right.
19     Did Ginger ever punch her out? Not punch her out. I
20 am not saying that right. Did Ginger ever stamp her
21 timecard?
22   A. I hope not, but I don't know.
23   Q. You don't know whether Ginger ever clocked people
24 out while they were still working?
25   A. She's not supposed to. No one is supposed to.

Page 100

1  That's her -- that's hers. They're supposed to punch in and
2  out themselves.
3    Q. All right. Let's look at the next page.
4    A. That's happened a lot of times. One employee
5  punched another one. The guy named -- wait a minute --
6  Eric, Eric would do it for her, I'm sure.
7    Q. Okay.
8    A. Would punch her out different times, and she would
9  go home at 4:00 in the afternoon, 3:00, and he would punch
10 her out. I didn't trust him too well.
11   Q. The next page we don't have -- doesn't appear we
12 have the timecard to go with this paycheck.
13   A. Nothing on here, no.
14   Q. But you paid her for 40 hours?
15   A. I usually do whether she is there or not, yeah.
16   Q. So your belief would be that she didn't work at
17 all this week, and that's why this timecard --
18   A. No. No. It -- I couldn't say that, no.
19   Q. Do you know what happened to the timecard that
20 goes with this pay stub?
21   A. Well, she may not have worked. I don't -- I do
22 not know.
23   Q. Okay. So you paid her whether she worked?
24   A. No. No. I wouldn't pay her if she didn't show up
25 all week, no.

Page 101

1    Q. So we don't know where that timecard is?
2    A. That, I do not know.
3    Q. Let's go to the next page. That's the one. The
4  timecard is marked 6-26 of '15.
5    A. Yeah.
6    Q. And is that Stephanie's handwriting?
7    A. I presume it is. It looks the same, uh-huh.
8    Q. All right. And is that your handwriting, the 32
9  hours?
10   A. No. I don't think it is. That's likely Julie's
11 handwriting when she figured the time. I'm not sure.
12   Q. Okay. So sometimes you would figure out how many
13 hours the employees should get paid for, and sometimes Julie
14 would do that?
15   A. Very seldom I would. Very seldom, unless Julie
16 came to me with a question or something. I would try to
17 correct it with Julie. She done all the timecards.
18   Q. Did you have a standard number of hours that you
19 deducted from your employees --
20   A. No. No.
21   Q. -- for lunch?
22   A. For lunch?
23   Q. Yeah. Like did you take off half an hour?
24   A. Half an hour, sometimes an hour.
25   Q. Well --

Page 102

1    A. If they had their own business to attend to, if
2  they had a doctor appointment, they might take two hours.
3    Q. Right.
4    A. I wouldn't question it if they had a legitimate
5  question.
6    Q. So was there a standard amount of hours that you
7  deducted from everybody's pay for lunch?
8    A. Half an hour supposed to be.
9    Q. Half an hour?
10   A. Yeah. Now, Ginger punches in and punches out.
11 Stephanie never did.
12   Q. So how many employees were using the time clock in
13 2015, in June of '15 when this --
14   A. I think just Stephanie and -- well, I don't know
15 when Eric worked there. I don't remember. There could have
16 been three. I'm not sure.
17   Q. All right. So it would have been Ginger --
18   A. Stephanie and maybe Eric. I'm not sure. I don't
19 remember the dates she started and quit, no, or got laid
20 off.
21   Q. And Eric's last name?
22   A. Don't know.
23   Q. I assume in your business records you have --
24   A. Oh, sure.
25   Q. -- his last name and his last address?

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 103 to 106)

---

Page 103

1      A.  Oh, sure.  And I don't remember all these names.
2   I have too much to think about.  But he was a good employee
3   while he stayed, but he wouldn't show up on time.  He would
4   take days off, so he didn't last that long.
5      Q.  Let's go to the next page.  This is a timecard
6   dated 7-15.
7      A.  Uh-huh.
8      Q.  Is that your handwriting 8 and 4:30?
9      A.  It could be, but I'm not aware of it.  I see the
10  number 8 there.  That's not the way I make my 8, and the
11  others 8, 8, 8.  Stephanie is usually on time.
12     Q.  Let's go to the next one.
13     A.  Which one now?
14     Q.  The timecard dated 7-10.
15     A.  Okay.
16     MS. NIERENBERG:  I am sorry, but I will have to take
17  another break in a couple minutes to go to the bathroom, if
18  that's okay.
19     MS. DELL'OLIO:  Do you want to take an early lunch?
20     MS. NIERENBERG:  Whatever works best for you.
21     MS. DELL'OLIO:  All right.  Do you want to wait until
22  11:30, and we'll take lunch, or do you need a break -- go
23  ahead.
24     MS. NIERENBERG:  Sorry.  About that.
25     (Short break taken.)

---

Page 104

1   BY MS. DELL'OLIO:
2      Q.  So we're back on the record.  And looking at a pay
3   stub that's dated 7-3 of '15.
4      A.  7-10 of '15, you said?
5      Q.  I was looking at 7-3.  Did you go to 7-10?
6      A.  Yeah.  Well, I have them both here.
7      Q.  All right.  Let's look at 7-3 and just reconfirm
8   for me that that's your -- oh, you didn't -- you are right.
9   We did move on to the next one.
10     A.  Yeah.
11     Q.  Let's go to 7-10.
12     A.  Uh-huh.
13     Q.  Is that Stephanie Lopez' signature at the top?
14     A.  I presume so.  I don't know.
15     Q.  And the 4:30, you don't know whether that's your
16  handwriting, or you do?
17     A.  That, I'm not sure, but someone did mark around
18  either me or my daughter.
19     Q.  All right.  And the --
20     A.  They get -- to come up with 40 hours, yeah.
21     Q.  All right.
22     A.  Now, if we go through all these, it's going to
23  take until 5:00 to do it.  I don't remember all these.
24     Q.  Well, I have some questions to ask you.  It won't
25  take too long.

---

Page 105

1      A.  Okay.
2      Q.  Is the 40 in your handwriting?
3      A.  I'm not sure.  No, I don't think so.  That's
4   likely Julie's.
5      Q.  Is it your testimony that when your employees
6   worked over 40 hours, you would pay them time and a half?
7      A.  We didn't work them over 40 hours.
8      Q.  So if we were to look at the pay stubs for your
9   employees for the period of time --
10     A.  Uh-huh.
11     Q.  -- 2013 to the present, we wouldn't see any time
12  and a half on those pay stubs?
13     A.  I don't think so, no, because I'm pretty cheap.  I
14  don't believe in time and a half.
15     Q.  Okay.
16     A.  If they can't do it in 40 hours --
17     Q.  Right.  All right.  So --
18     A.  Most of them worked a lot less than 40 hours.
19     Q.  7-17 --
20     A.  17.
21     Q.  -- of '15.
22     A.  Yeah.
23     Q.  Stephanie's signature at the top?
24     A.  Same thing.  I guess that's her signature.  You
25  keep asking me that.  I think it is.

---

Page 106

1      Q.  All right.  And then the handwritten 4:30, is that
2   your handwriting?
3      A.  I'm not sure.
4      Q.  The 40, is that your handwriting?
5      A.  I don't think so.  That's likely Julie's.
6      Q.  So if someone --
7      A.  That's how she computes her time to pay her.
8      Q.  7-24, same question.  Is that her signature?
9      A.  I think all of them will be her signature.  I'm
10  not sure.
11     Q.  Well, we're going to look at them.
12     A.  Yeah.
13     Q.  So there aren't that many.
14  7-24, you believe that's her signature?
15     A.  Her last name is pretty scribbled.  I don't know.
16  I couldn't say.
17     Q.  All right.  And 4:30 -- where it's 4:30 --
18     A.  She was marked out at 4:30.
19     Q.  You think that's Julie's handwriting?
20     A.  I don't know.
21     Q.  Next one is 7-31.  Where 40 is written on the
22  timecard, are you saying -- I thought you were saying
23  earlier that you were the one that would write the number of
24  hours --
25     A.  No.

---

Denver          Pelton Reporting Service, Inc.          Local
(303) 575-6606          www.peltonreporting.com          (719) 578-2062

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 107 to 110)

Page 107

1    Q.  -- the employees would get paid.
2    A.  No.  No.  No.  Nope.  Julie does all the
3    timecards.  No.  See, there's days she -- first day she
4    punched in, she didn't punch out.  She punched in the second
5    day, didn't punch out.  Punched the third day, punched
6    out at 9 something.  She didn't punch out.  And she get paid
7    for 40 hours of work.
8    Q.  Okay.
9    A.  Because --
10   Q.  The next one is 8-7 of '15.
11   A.  Okay.
12   Q.  And the 32 could be Julie's handwriting?
13   A.  Possible, uh-huh.  And she only worked one, two,
14   three, four days there.
15   Q.  And the next one is 8-14.  She was paid for 32
16   hours.
17   A.  Uh-huh.  See, she didn't punch out on the last
18   day.  No one marked her out, so --
19   Q.  8-21.
20   A.  Next one she punched in and out, but she didn't
21   punch out, didn't punch out, didn't punch out.  I don't know
22   what -- how she got paid or what she got paid on that one.
23   Likely 40 hours also.  We used her pretty darn good.
24   Q.  The next one --
25   A.  The next one is --

Page 108

1    Q.  -- doesn't have a date on it.
2    A.  Punched in at 7:00 and punched out at 4:35, one
3    day.
4    Q.  And you paid her for 40 hours?
5    A.  Likely.  I am not sure.
6    Q.  Well, there's a pay stub next to it.
7    A.  Oh, is there?  I am sorry.
8    Q.  There's a pay stub next to it.
9    A.  I didn't look at this.
10   Q.  It says 40 hours.
11   A.  Yeah.  We paid her for 40 hours whether she is
12   there or not.
13   Q.  Are you claiming she wasn't there for 40 hours?
14   A.  Well, she didn't punch in and out.  How am I going
15   to know?
16   Q.  You don't know if she was there or not?
17   A.  No, I don't.  A lot of times she wasn't, and she
18   still got a full week's pay.
19   Q.  Would you agree that there were times that she was
20   in the shop working, and she didn't punch in or out, but she
21   was in the shop working?
22   A.  No, not for -- not working for me.
23   Q.  That never happened?
24   A.  No.  No.
25   Q.  Okay.  And the next one is dated 9-4.

Page 109

1    A.  See, now she didn't punch out -- four days she
2    worked out of five, and she didn't punch out the fourth day
3    and still got the 40 hours of pay.
4    Q.  Well, you don't know what time she left, do you?
5    A.  No.  It doesn't show when she left, no.
6    Q.  All right.  But you paid her for 40 hours?
7    A.  It shows 40 hours, yes.  Well, look over here and
8    see if we paid her for 40 hours.  I never looked at these
9    before.
10   Q.  The pay stub says 40 hours.
11   A.  Okay.  So we paid her.
12   Q.  Are you saying she didn't work on that last day,
13   or --
14   A.  She may have.  I don't know.  I really don't know.
15   Q.  Well, I thought you knew that.
16   A.  She may have worked.  I'm not sure.  She punched
17   in, but now she spent a lot of time at the doctor's office.
18   She would come in the mornings.  She might start throwing up
19   at 9:00, get better, and 2:00 or 3:00 start going in the
20   other room in the bathroom and start heaving again, and she
21   would go to the doctor's or go home, and I think she was
22   consuming a lot of dope.  See, now the next -- oh, I'm
23   sorry.
24   Q.  Looking at the next one, would you agree that's
25   also an incomplete timecard?

Page 110

1    MS. NIERENBERG:  I am sorry.  Which one?
2    MS. DELL'OLIO:  9-11 of '15.
3    THE WITNESS:  She punched in and punched out, and she
4    punched in and didn't punch out, she punched in and didn't
5    punch out.
6    BY MS. DELL'OLIO:
7    Q.  Would you agree that's an incomplete record of
8    when she worked that week?  It's incomplete?
9    A.  There's no way to be known.  I couldn't answer yes
10   or no.  I only go by these, but it doesn't look like she
11   worked all week, no.
12   Q.  Well, would you agree it's an incomplete record as
13   to what hours she worked on Thursday?
14   MS. NIERENBERG:  Objection to form.
15   BY MS. DELL'OLIO:
16   Q.  It's a complete record of hours she worked?
17   A.  This would be the record of her hours she worked,
18   yeah.
19   Q.  Let's look at 9-18 of '15.
20   A.  Okay.  She punched -- she punched in at something
21   and punched back out at 9:00.  She only worked an hour maybe
22   on the fourth day.  The other days she punched out at 4:31,
23   -36, -30, and -30.  She punched in at 7:59, -59, -17.
24   MS. NIERENBERG:  Just to make things go a little
25   faster, I am going to have you wait for questions.

**Appendix 4**

Lopez v. Edwards          Carl Edwards          July 26, 2017

(Pages 111 to 114)

## Page 111

1  THE WITNESS: Yeah. Okay.
2  MS. NIERENBERG: Okay.
3  THE WITNESS: This is kind of --
4  BY MS. DELL'OLIO:
5  Q. I notice here that you gave her a raise to $15 an
6  hour.
7  A. Yeah.
8  Q. When did -- why did you give her a raise to $15 an
9  hour?
10  A. That's when she was in her home. She moved into
11  her home about that time. Prior to that she said, "I have
12  taxes to pay. Gas to pay. Electric to pay." All of this.
13  So we gave her another $5 an hour raise. She was a good
14  employee, I'm telling you.
15  Q. So she came to you twice and said, "I have gas and
16  electric"?
17  A. No, once.
18  Q. One time?
19  A. This --
20  Q. I thought that is why you put her on the payroll.
21  A. The first time was when she moved in her house,
22  yes. You are right.
23  Q. Okay.
24  A. Then when I gave her the raise is when she had all
25  these bills to pay. She came to me and said, "I can't do it

## Page 112

1  on $10 an hour."
2  Q. So she came to you twice about her gas and
3  electric bill?
4  A. I don't think she came to me twice. I think the
5  first time was voluntarily did I put her on the payroll. I
6  asked her did she want to go to work.
7  Q. Well, was there a time that she quit working for
8  you during this time in the summer of 2015 and went to work
9  for someone else?
10  A. Not that I know of. I think she worked for me
11  while she -- no. She -- I don't even think she had another
12  job.
13  Q. Do you remember asking her to come back and
14  telling her that you would pay her $15 an hour?
15  A. No. No. No. No.
16  Q. She came back?
17  A. No.
18  Q. So the raise from $10 to $15 an hour was given to
19  her solely because she told you she had utility bills, not
20  because --
21  A. Yeah.
22  Q. -- she had left?
23  A. No. No. She never left. And I never -- if they
24  have a reason, if they're sick, if they have a reason to
25  leave, I will take them back. If they left me to go to

## Page 113

1  another job, I will not hire them back. That's my -- that's
2  my standard. That's my motto.
3  Q. All right. Let's go to 9-25.
4  Whose writing is that "nens" or "ncns"? Do you know
5  what that is? Is that your writing, "ncns"?
6  MS. NIERENBERG: I don't think he can hear you.
7  THE WITNESS: I don't know what you are talking
8  about.
9  BY MS. DELL'OLIO:
10  Q. Go to the timecard that says 9-25 of 15.
11  A. Okay.
12  Q. The handwriting on there that says "ncns."
13  A. That's not my writing. I don't know what that is.
14  No. No. No. Couldn't say.
15  Q. Going to -- I'm going to have you skip ahead a
16  few.
17  A. Good.
18  Q. There's an undated timecard that says "Stef" at
19  the top.
20  Would that be your handwriting?
21  A. What? How far did you go?
22  Q. About five or six pages in.
23  MS. NIERENBERG: Is it 36?
24  MS. DELL'OLIO: It's dated -- it's the -- the number is
25  36 on it.

## Page 114

1  THE WITNESS: Oh, 10 of 30?
2  MS. NIERENBERG: I think that's the first one in the
3  stack -- or, no. I am sorry. This one.
4  THE WITNESS: Keep on -- see, that's not my writing.
5  It's not hers.
6  BY MS. DELL'OLIO:
7  Q. Keep going. There's one that has "Stef" written
8  at the top.
9  MS. NIERENBERG: So Bates 36 --
10  THE WITNESS: Yeah. I don't really -- don't know.
11  MS. NIERENBERG: -- for the record.
12  BY MS. DELL'OLIO:
13  Q. You don't know if that's your writing that says
14  "Stef"?
15  A. No, I don't. It shows that she worked 16 hours
16  for that.
17  MS. NIERENBERG: For the record, is that 36 that we are
18  talking about?
19  MS. DELL'OLIO: Yes.
20  MS. NIERENBERG: Okay.
21  BY MS. DELL'OLIO:
22  Q. Now, did you pay any of your employees sick time?
23  A. No.
24  Q. Okay.
25  A. If they took a day off, it was their loss.

**Appendix 4**