**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-00045-CMA-KLM

STEPHANIE LOPEZ, individually,

     Plaintiff,

v.

CARL EDWARDS, individually, and
CASPER TRAILER SALES, INC., a Colorado Corporation,

     Defendants.

---

**DEFENDANTS' MOTION TO EXCLUDE THE EXPERT HANDWRITING TESTIMONY
OF WENDY CARLSON**

---

Defendants Carl Edwards and Casper Trailer Sales, Inc., pursuant to Fed. R. Evid. 702 and Civil Practice Standards of Judge Christine M. Arguello, hereby respectfully move to exclude all testimony of Plaintiff's handwriting expert Wendy Carlson.

**D.C.COLO.LCivR 7.1 Certificate of Conferral**: Defendants' counsel conferred with Plaintiff's counsel regarding this Motion in a detailed email exchange on March 1, 2018, and March 7, 2018. Plaintiff opposes the relief requested herein.

## I.  INTRODUCTION

This Motion seeks an Order excluding all opinion testimony of Ms. Carlson, Plaintiff's handwriting expert in this wage and hour dispute. Ms. Carlson issued a report on October 26, 2017 in which she offers her opinion that disputed signatures appearing on four documents are genuinely those of Defendant Carl Edwards. In her report, Ms.

Carlson states that her methodology consists of the "'ACE' method."

Simply put, the "ACE method" is no more than a series of steps—Analysis, Comparison, Evaluation—that are inherently subjective and untested. Not only does this "method" not contain any specific guidelines or standards for how each of the steps is to be conducted, but no scientific study has validated its use. While Defendants are mindful that "rejection of expert testimony is the exception rather than the rule," *United States v. Nacchio*, 519 F.3d 1140, 1154 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009) (citing Fed. R. Evid. 702, 2000 Advisory Comm.'s Notes), this case calls for application of the exception.

Many courts, including some in this Circuit, that have examined handwriting testimony under *Daubert* have either rejected it outright or have come up with a Solomonic approach that allows experts to provide evidence of handwriting characteristics while coming short of issuing ultimate conclusions on the authorship of a signature. Here, Ms. Carlson shouldn't even be able to offer evidence on characteristics of the questioned signatures because she only identifies similarities, and no dissimilarities, despite having stated in her own report in another recent District of Colorado case that it is crucially important to identify dissimilarities in allegedly forged signatures.

As to her ultimate opinions, those opinions—in addition to being unreliable—would not be helpful to a jury because the authorship of the signatures on the questioned documents is only indirectly related to a material issue in the case and has far greater potential to impermissibly affect credibility determinations than provide any actually relevant information.

## II. BACKGROUND

Plaintiff, Ms. Lopez, disclosed five handwritten notes as the basis for her claim that Mr. Edwards' company employed her prior to May 2015. *See* **Exhibit A**, notes. The notes state disparate information concerning Ms. Lopez's alleged employment relationship with Mr. Edwards and/or his company. *Id.* Ms. Lopez admits that the original purpose of these notes was obtaining food assistance from Pueblo Social Services. **Exhibit B**, Lopez Dep. at 2 (transcript p. 220:18-221:21).

Mr. Edwards admits to signing the 2012 note, which is written on paper stamped with his company masthead, in order to help Ms. Lopez obtain food stamps. **Exhibit C**, Edwards Dep. at 2 (transcript p. 70:13-25). But from the outset of this case, Mr. Edwards has consistently disputed that the other notes contain his genuine signature, despite possessing signatures resembling his. *Id.* at 3-5 (transcript pp. 74:24-78:9); **Exhibit D**, Responses to Third Set of Discovery (Requests for Admission). Mr. Edwards further disputes that the notes are evidence of Ms. Lopez's employment with his company. *See* Repl. Mot. Summ. J. [ECF no. 71] at 5-6.

Ms. Lopez engaged Ms. Carlson to provide an expert opinion on the authorship of the disputed signatures on the four questioned notes. In correspondence, counsel for Ms. Lopez informed Ms. Carlson that Mr. Edwards had denied signing the notes. **Exhibit E**, emails. Ms. Carlson issued her report on October 26, 2017. **Exhibit F**, Report. The report includes a list of similarities Ms. Carlson claims to have found in the questioned signatures when compared to the "known" Carl Edwards signatures. *Id.* at 8-9 (report pp. 6-7). In her report, Ms. Carlson concludes with two paragraphs in which she expressly offers her

3

opinion on the genuineness of the disputed signatures, the sum of which is that Mr. Edwards signed the questioned notes.[1] *Id.* at 9 (report p. 7).

In her report, Ms. Carlson states that she follows "generally accepted Questioned Document Examiner principles" and, of her methodology, she states:

> The scientific methodology used in this examination consists of the "ACE" method, which means "Analyze, Compare, Evaluate," the same method reportedly used by the FBI, the U.S. Treasury Department, and the U.S. Postal Service in their questioned document laboratories, and suggested by the recommended standards and guidelines of the ASTM and the Scientific Working Group for Forensic Document Examination (SWGDOC). This method was also accepted and affirmed by the District of Columbia Court of Appeals in Case No, 08-CF-1361, *Pettus v. United States*.

*Id.* at 8 (report p. 6). Ms. Carlson also cites two studies to support the reliability of handwriting expert analysis generally. *Id.* at 9 (report p. 7).

## III. DISCUSSION

### A. Governing Standard – The Court's Gatekeeping Role

Federal Rule of Evidence 702 governs the admission of expert testimony. *U.S. v. Call*, 129 F.3d 1402, 1404 (10th Cir.1997). It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] Because the objections contained in this Motion pertain to all opinions contained in Ms. Carlson's report, and as such the only opinions Plaintiff properly disclosed, Defendants request that this Court preclude all testimony by Ms. Carlson. CMA Civ. Practice Standard 7.1C(b)(1). Defendants do not believe an evidentiary hearing is necessary. *Id.* 7.1C(c).

Fed. R. Evid. 702.

Rule 702 imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *U.S. v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To perform that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). Unscientific speculation, even if offered by a genuine scientist, is not considered reliable under the strictures of *Daubert* and Rule 702. *Mitchell v. Gencorp Inc.*,165 F.3d 778, 783 (10th Cir. 1999).

The proponent of the expert testimony bears the burden of establishing the foundational requirements of Rule 702 by a preponderance of the evidence. *Nacchio*, 555 F.3d at 1241.

### B.  *"ACE" Is Not A Method Itself And Is Not Reliable Under* Daubert *And Rule 702*

This Court as gatekeeper must closely analyze whether Ms. Carlson's "ACE method" meets the standard of *Daubert* and its progeny.

> The requirement that an opinion be derived from reliable principles or methods, known colloquially as "methodology," involves two related inquiries: (i) what methodology did the witness use to reach the opinion; and (ii) is that methodology generally deemed "reliable" in the field in which the expert works. Both inquiries are entirely factual in nature, and the proponent of the opinion must establish both inquiries by sufficient, competent evidence.

*U.S. v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008). By her own terms, Ms.

Carlson claims to use the "ACE method." Thus, the relevant question is whether this method is deemed "reliable" in the field of handwriting expertise.

Ms. Carlson's report states that the "ACE method" was upheld by the D.C. Circuit in *Pettus v. U.S.*; however, this is misleading. In 2012, the D.C. Court of Appeals upheld the trial court's decision that the "ACE-V method" of handwriting analysis advanced by the FBI document examiners passed the test for admissibility under *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923). *Pettus v. U.S.*, 37 A.3d 213, 224 (D.C. 2012). As the *Pettus* court recognized, ACE-V is a *four* step process followed generally in expert comparison of handwriting. 37 A.3d at 224. ACE-V stands for Analysis, Comparison, Evaluation, and Verification. *Pettus*, 37 A.3d at 219. The final step refers to a process whereby another examiner goes through the same analysis to evaluate the conclusion of the first examiner using the same work product. *Id.* It was in fact this four step process that was accepted by the D.C. Circuit in *Pettus*, not a three step "ACE method."

But more critically, the *Pettus* court found that the opinions in that case were only reliable because the experts applied additional methodology *beyond* the four steps, such as published standards. The *Pettus* court found that the FBI's method went "beyond the four sequential steps … [and] showed that at each of the four ACE-V steps document examiners descended to the specific by using multiple standard (and published) handwriting characteristics to reach conclusions of or against identification." *Id.* In reaching this conclusion, the court recognized that additional standards must be used to avoid a "skeletal ACE-V set of steps." *Id.* As the *Pettus* court recognized, ACE-V (let alone, ACE) without additional standards is not sufficient to support a reliable opinion.

This conclusion is supported by other sources. In 2009, the National Research Council issued a report on the state of forensic science. *See* Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf (hereinafter "NRC Report"). The report explains additional reasons why simply following ACE-V on its own is problematic:

> ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. For these reasons, merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner producing reliable results.

*Id.* at 142.[2] As one scholar has said, ACE-V should not even be considered methodology because it does not provide any specifics on how the steps are carried out.

> The basic difficulty is that ACE-V is too general in conception and scope to provide much in the way of guidance or constraint for those who practice it. The devil is in the details—what constitutes analysis? How exactly does a competent comparison take place? When are apparent similarities misleading, and when might apparent differences be attributed to something other than the two prints deriving from different sources? ACE-V, as a methodology, does not help answer any of these critical methodological questions, because its categories are too general and insufficiently substantive.

Jennifer L. Mnookin, *The Courts, the Nas, and the Future of Forensic Science*, 75 BROOK. L. REV. 1209, 1219 (2010); *see also* Triplett and Cooney, *The Etiology of ACE-V and its Proper Use*, 56 J. FORENSIC IDENTIFICATION 345, 353 (2006), *available at*

---

[2] The report discusses ACE-V in the context of fingerprint analysis, not handwriting. The section on handwriting expertise concluded that "[t]he scientific basis for handwriting comparisons needs to be strengthened." NRC Report at 166. The report also questions whether there is a scientific basis for handwriting comparison in the context of intentional obfuscation or forgery, the subject of the expert opinion in this case. *Id.* at 166-67.

http://www.fprints.nwlean.net/JFI.pdf ("ACE-V is a valid scientific method *if it is used as a valid scientific method*."); *U.S. v. Baines*, 573 F.3d 979, 991 (10th Cir. 2009) ("The ACE-V system is a procedural standard but not a substantive one. Critical steps in the process depend on the subjective judgment of the analyst.").

Moreover there is no scientific study that supports the reliability of the ACE (or ACE-V) method under the *Daubert* factors. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94) ("When assessing reliability, 'the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community.'"). Several studies have been performed to test the reliability of handwriting expertise using various methods. D. Michael Risinger, *Appendix: Cases Involving the Reliability of Handwriting Identification Expertise Since the Decision in Daubert*, 43 TULSA L. REV. 477, 480 (2007) (hereinafter "Risinger Appendix"). None of these studies supports the so-called ACE (or ACE-V) method.

Specifically, neither of the studies Ms. Carlson cites in her report evaluated the ACE (or ACE-V) method. *See id.* at 488-89, 494. The study by Professor Srihari cited by Ms. Carlson tested the ability of computers to sort documents. *Id.* at 494. According to one researcher, the Srihari study "is fundamentally irrelevant to the issues in play when a challenge to human document examiner reliability is raised" and shows only that "computer algorithms can make computers good (but not perfect) at a machine-read sorting exercise." *Id.* at 494. The Kam study cited by Ms. Carlson was designed to

compare the performance of human experts and non-experts at various handwriting examination tasks. *Id.* at 489. In the study,

> the experts and the non-experts performed virtually identically when it came to identifying actual matches (87.1% to 87.5%), but the document examiners performed better at avoiding false positives (calling a "match" in regard to two documents written by different people). The experts did this 6.5% of the time, but the non-experts did this 38.3% of the time.

*Id.* According to the same researcher, "[d]rawing any firm conclusions about an expert advantage over non-experts from [the Kam studies] results is difficult." *Id.* The results certainly do not indicate anything about the reliability of the "ACE method" and indicate between a 6.5% and 12.9% error rate for general handwriting analysis.

For these reasons, Ms. Carlson's opinions are not a product of reliable principles and methods (the "ACE method") and should be excluded.

### C. Courts In This Circuit Have Excluded Expert Handwriting Analysis Outright Or Engaged In A Compromise Solution To Allow Only Characteristics Evidence

Courts reviewing admissibility of expert handwriting opinion in this Circuit and elsewhere have designed a Solomonic approach whereby an expert may offer analysis of the similarities and differences in handwriting, but may not give an ultimate opinion as to authorship. *See, e.g., U.S. v. Hernandez*, 42 F. App'x 173, 176-77 (10th Cir. 2002) (not selected for publication in the Federal Reporter); *U.S. v. Hines*, 55 F. Supp. 2d 62, 67-71 (D. Mass 1999); *U.S. v. Rutherford*, 104 F. Supp. 2d 1190 (D. Neb. 2000); *U.S. v. Oskowitz*, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003); *Legacy Vision, LLC v. Yeamans*, No. CIV-04-1320-M, 2005 WL 6227149, at *8 (W.D. Okla. June 6, 2005) (collecting cases). These Courts are unanimous in their skepticism that "questioned document examiners can capably and reliably conclude that one person or another *in fact* authored

a particular handwriting specimen." *Legacy Vision,* 2005 WL 6227149, at *8.

One early court to adopt this approach was Judge Matsch of the District of Colorado during an evidentiary challenge to proposed handwriting testimony in the prosecution of Timothy McVeigh.[3] *U.S. v. Hines*, 55 F. Supp. 2d 62, 70 (D. Mass. 1999) (citing to transcript from *U.S. v. McVeigh*); Risinger Appendix, 43 Tulsa L. Rev. at 595 (citing Pre-Trial Transcr., McVeigh, 1997 WL 47724.). Judge Matsch ruled after hearing that the proposed document examiner would be allowed to point out the characteristics evident on the known and questioned documents, but would not be allowed to give a conclusion as to whether McVeigh did or did not write the documents at issue. *Id*

In 2002, the Tenth Circuit Court of Appeals upheld the trial court's decision permitting the government's document examiner to testify to the similarities and dissimilarities between the questioned documents and known documents, but barring the expert from issuing an opinion that the handwriting belonged to defendant or that the documents shared common authorship. *Hernandez*, 42 F. App'x at 176-77.

However, not all Courts have adopted this approach when the expert's methodology is too fundamentally unreliable. *See, e.g., Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 426 (S.D.N.Y. 2016) ("That Solomonic solution might be justified in some circumstances, but it cannot be here where the Court finds the proffered expert's methodology fundamentally unreliable and critically flawed in so many respects."); *U.S. v. McDaniels*, No. 12-393-01, 2014WL2609693 (E.D. Penn. June 11, 2014) (excluding expert handwriting opinion despite recognizing that the Third Circuit has

---

[3] This information is obtained from discussion in other cases and secondary sources.

held that handwriting analysis and the ACE-V method generally pass muster under Rule

702 and *Daubert*). As demonstrated elsewhere in this Motion, this Court should reject

both types of opinions in this case—characteristics evidence and ultimate authorship

conclusions—on the basis that they are both unreliable and unhelpful.

### D. Ms. Carlson Should Not Be Permitted To Testify To The Characteristics Of The Signatures Or Her Ultimate Opinions Because She Does Not Comply With Accepted Document Examiner Standards, Including Her Own In Similar Cases

Carlson claims that the "ACE method" is the standard suggested by ASTM and the

Scientific Working Group for Forensic Document Examination (SWGDOC). ASTM has

published standards pertaining to examination of handwritten items developed by

SWGDOC.[4] They contain the following relevant standards relevant to "ACE":

> 7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing. […]
> 7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.
> 7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

**Exhibit G**, standards, at 3.

Ms. Carlson's opinions are not based on a proper application of these published

ASTM/SWGDOC standards because they require consideration of both similarities and

dissimilarities in a comparison of known to questioned signatures: "7.12.5 Evaluate the

similarities, differences, and limitations. Determine their significance individually and in

combination." *Id.*; *see also id.* at 2 (5.2 Limitations).

Ms. Carlson's report in this case does not analyze a single difference between the

---

[4] SWGDOC now publishes these standards. http://www.swgdoc.org/index.php/about-us.

known and questioned signatures. *See generally* **Ex. F.** However, the fact that Ms.

Carlson only reviews similarities does not mean that there are only similarities. To the

extent that Ms. Carlson has not opined on the dissimilarities, her opinions are not based

on proper application of the standards she purports to follow.

Ms. Carlson's report for her client in a recent District of Colorado case is illustrative

of this point, because her report in that case underscores the importance *as she stated it*

of reviewing differences in order to identify a forgery. **Exhibit H**, Porcenlanosa Report

(select pages). In that case, Ms. Carlson was asked to determine whether a questioned

signature that looked similar to the known signatures was in fact a true signature. *Id.* at 1

(ECF p. 50).[5] Ms. Carlson indicated the importance of considering *dissimilarities* when

reviewing signatures:

> The leading forefathers of document examination in the USA agree that one
> significant difference in the fundamental structure of a writing compared to
> another is enough to preclude common authorship.

*Id.* at 5 (ECF p. 54).[6] Ms. Carlson also cites to and inserts into her report four statements

from the book *Handwriting Identification, Facts and Fundamentals* by Roy A. Huber and

A.M. Headrick that all support the same basic premise: that *even one dissimilarity* in any

fundamental feature of the writings is sufficient to rule out common authorship. *Id.* Thus,

by Ms. Carlson's own prior statements, to review only similarities and not differences, yet

---

[5] In that case, what Ms. Carlson ultimately determined to be a forgery also appeared to
be very similar to the other "known" signatures by Defendant's agent. *See* **Ex. H**, at 9-10
(ECF pp. 58-59).

[6] In that report, Ms. Carlson claimed to follow the "ACE-V method," and stated (like in the
case at hand) that it was "the same method reportedly used by the FBI, the U.S. Treasury
Department, and the U.S. Postal Service," and "accepted and affirmed by the District of
Columbia Court of Appeals in Case No. 08-CF-1361, *Pettus v. U.S."* *Id.* at 2 (ECF p. 51).

reach a conclusion of common authorship (as Ms. Carlson did of the Carl Edwards signatures), is a fatal departure from accepted standards.

This departure alone is so significant as to render Ms. Carlson's opinions unreliable and inadmissible. *Accord McDaniels*, 2014 WL 2609693, at *5 (holding that an expert who failed to note both similarities and differences shows the expert did not accurately follow the second stage of the ACE process, to "compare," and by failing to balance similarities and differences between questioned and known writings also failed to "evaluate."); *Mitchell*, 165 F.3d at 782 ("Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.").[7]

### E. Carlson's Opinions Are Unhelpful To The Trier Of Fact Because They Do Not Address Any Ultimate Issue And Instead Offer Improper Credibility Evidence

"Relevant expert testimony must logically advance a material aspect of the case

---

[7] While this is by far the most significant flaw in Ms. Carlson's application of accepted standards, and sufficient to render her opinions inadmissible, it is by no means the only flaw. Ms. Carlson does not rely on originals of the questioned documents, does not compare the questioned signatures to a significant number of known signatures from the same time period, does not follow the fourth step of the ACE-V methodology, and does not formulate her conclusions based on accepted terminology. **Ex. G; Exhibit I**, Joseph Report; **Exhibit J**, standards. Ms. Carlson also mistakes one questioned signature for a known signature, rendering her premises significantly flawed. **Exhibit K**, email and attachment. At this rate, Defendants will need to cross-examine Ms. Carlson on every aspect of her opinions and her basis therefor, which will waste considerable time in a four day jury trial. Following trial in *Crew Tile v. Porcelanosa*, Judge Martinez had the following to say regarding Ms. Carlson's testimony: "Although Ms. Carlson was credible as a witness in explaining her opinions and how she reached them, the Court also found that Crew Tile's cross-examination was effective in showing these opinions should be given comparatively less weight." *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-CV-3206-WJM-KMT, 2017 WL 4988667, at *6 n. 8 (D. Colo. Nov. 2, 2017). As a result, Judge Martinez ultimately avoided relying on Ms. Carlson's testimony in ruling on equitable claims. *Id.*

and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *U.S. v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted). Ms. Carlson's expert handwriting opinion is not materially relevant to an ultimate issue in this wage and hour case. Plaintiff needs to establish that she was an employee of Mr. Edwards in order to prove her claims. It is properly the jury's task in this case to determine whether the *content* of the notes, if admitted into evidence, demonstrates evidence of Ms. Lopez's employment by Casper Trailer Sales.[8]

Whether or not Mr. Edwards was the true signer does not remotely resolve this issue. Ms. Carlson's expert speculation regarding the ultimate signatory of the notes is immaterial to this issue, because the notes themselves were undisputedly provided to Pueblo Social Services to assist Ms. Lopez in obtaining food stamps and were not generated as or intended to be an employment record. The importance of determining the true signatory of the notes thus is only indirectly related to the value of the text of the notes themselves as evidence (or not) of Ms. Lopez's employment.

This can be distinguished from cases such as *Crew Tile v. Porcelanosa*, wherein whether a document contained a true signature was essential to an ultimate fact issue. 2017 WL 4988667, at *2. In that case, the central issue was the validity of a disputed distributor agreement, which seemingly bore a signature of Defendants' agent. *Id.* The dispute centered around whether the agreement granted Plaintiff valuable economic rights or was a forgery. *Id.* The genuineness of the signature thus went to an essential

---

[8] It remains Defendants' position that, given disputed authorship of the signatures on these notes, the hand-written statements contained therein are those of Ms. Lopez and constitute hearsay when used as evidence of the truth of Ms. Lopez's employment.

aspect of the plaintiffs' breach of contract and defendants' abuse of process claims. *Id.*

While there is no similarly direct benefit of the expert opinion to the claims and defenses in this case, there is a clear risk. This case is one which will likely be won or lost on the credibility of key witnesses Ms. Lopez and Mr. Edwards. *See* Final Pretrial Order [ECF no. 76] at 1-4 (Claims and Defenses). There is almost no factual overlap between their recollection of events, as exemplified by the dispute over the genuineness of signatures on the notes. *Id.* Therefore, Ms. Carlson's opinions must be given extreme scrutiny to determine whether they justify the prejudice to Mr. Edwards that will surely come from hearing an "expert" opine that he signed documents he says he did not.

If the Court were to admit Ms. Carlson's opinions concerning authorship of the notes, even with a strong cross-examination, the damage will be done of having an expert weigh in on Ms. Lopez's case. *Accord Legacy Vision*, 2005 WL 6227149, at *8 ("Relatedly, the Court is concerned about the substantial possibility that a jury will accord undue weight to the subjective authorship opinion of an 'expert' in the field of questioned document analysis, notwithstanding any limiting instructions to the contrary."). Judging credibility is a special providence of the jury. *U.S. v. Gonzalez-Perez*, 573 F. App'x 771, 777 (10th Cir. 2014); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997). Ms. Lopez should not be able to purchase credibility through an expert, especially one whose opinions are fundamentally unreliable and unhelpful.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and exclude all opinion testimony of Plaintiff's handwriting expert Ms. Carlson.

Respectfully submitted this June 21, 2018.

GODFREY | JOHNSON, P.C.

*/s/Lily E. Nierenberg*
Lily E. Nierenberg
Colorado Bar No. 45451
9557 S. Kingston Court
Englewood, Colorado 80112
Phone: (303) 228-0700
Fax: (303) 228-0701
Email: nierenberg@gojolaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 21, 2018, a true and correct copy of the foregoing Defendants' Motion To Exclude The Expert Handwriting Testimony Of Wendy Carlson was filed and served via ECF/PACER on all parties of record, as follows:

Donna Dell'Olio
Cornish & Dell'Olio
431 N. Cascade Avenue, Suite 1
Colorado Springs, CO 80903

*Attorney for Plaintiff*

*/s/Lily E. Nierenberg*
Lily E. Nierenberg